LOCAL 715, UNITED RUBBER, CORK, LINOLEUM AND PLASTIC WORKERS OF AMERICA and International Union of United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, Plaintiffs,

v.

MICHELIN AMERICA SMALL TIRE f/k/a Uniroyal Goodrich Tire Company, A wholly owned subsidiary of Groupe des Establishments Michelin, Defendant.

No. 1:93CV324.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Dec. 22, 1993.

Larry J. Burke, Fort Wayne, IN, Craig D. Doyle, Gene R. Leeuw, Joseph W. Murphy, Klineman Rose Wolf and Wallack, Indianapolis, IN, for plaintiffs.

J. Michael O'Hara, Thomas M. Kimbrough, Barrett and McNagny, Fort Wayne, IN, Steve Nail, Legal Dept., Michelin Tire, Greenville, SC, Harley M. Kastner, David P. Hiller, Millisor and Nobil, Cleveland, OH, for Michelin America Small Tire.

Joseph W. Shull, Fort Wayne, IN, for Joseph Shull.

Herbert C. Snyder, Jr., Barnes and Thornburg, Fort Wayne, IN, for Herbert Snyder.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on plaintiffs' motion for preliminary injunction to maintain the status quo at the Woodburn plant, enjoin the defendant from moving equipment, laying off workers or cutting wages and to require the defendant to process grievances through arbitration. This action was commenced on December 8, 1993 when plaintiffs filed their complaint, the present motion and the accompanying brief in support thereof. Defendant filed its brief in response on December 13 and the court held a hearing on December 14 and 15. The parties submitted supplemental briefs on December 17.

### Background

Local 715 and the United Rubber Workers International Union (collectively "the union") seek a preliminary injunction to maintain the status quo at the Uniroyal Goodrich/Michelin plant in Woodburn, Indiana until arbitration is completed. The union and Uniroyal Goodrich/Michelin ("Michelin") are parties to a Uniform collective bargaining agreement ("CBA"). This Uniform CBA covers union members at the Woodburn plant as well as at Michelin plants in Opelika and Tuscaloosa, Alabama. The Uniform CBA requires arbitration for disputes and requires the parties to "diligently process[ ] all grievances." In addition, Local 715 and Michelin are parties to a supplemental bargaining agreement

which covers terms specific to the Woodburn plant.

The union contends that, according to the Uniform CBA, all negotiations over workplace conditions, whether company-wide or local, are subject to company-wide approval and must be negotiated through the International Union policy committee. The union contends that Article III of the CBA prohibits Uniform CBA modifications by a local unit acting alone. Michelin contends that it has been the custom and practice of the company and the union locals to locally negotiate workrule changes according to special needs of the particular plants.

The union contends that Michelin approached the workforce directly at the Alabama plants and implemented substantial changes in workrules without negotiating through the International Union's policy committee, in contravention of the Uniform CBA. These changes at the Alabama plants allegedly threatened job security at the Woodburn, Indiana plant by decreasing production costs in Alabama which, the union argues, will encourage Michelin to shift more production to those plants. Michelin argues that, should the Woodburn plant close, no production will be shifted to the Alabama plants.

In September, 1993 Local 715 filed grievances contesting the changes at the Alabama plants and their method of implementation. The union contends that Michelin denied the grievances "out of hand and unilaterally dismissed the arbitrator [Jonathan Dworkin]." Subsequently, Michelin filed two declaratory judgment actions in federal court in Alabama seeking to have the local modification agreements declared valid.

Michelin argues that it dismissed the permanent arbitrator because of previous decisions he rendered that Michelin considered inappropriate and biased. Michelin is currently contesting these decisions in a lawsuit filed in Alabama. Michelin contends that, given the "strong disagreement with Dworkin's ruling[s], [it] exercised its right under the collective bargaining agreement to terminate him." Michelin asserts that the "right" to terminate the arbitrator stems from prior practice of the parties in executing the uniform CBA. Michelin further states that both parties are currently participating in the proper procedure to replace the arbitrator and the selection of a new arbitrator is nearly complete.

Regarding the current controversy at the Woodburn, Indiana plant, in September 1993 Michelin approached Local 715 to discuss possible workrule changes that would increase productivity at the Woodburn plant. Michelin was prompted to consider workrule changes based on multi-million dollar losses it contends it is facing from the Woodburn facility. The union argues that Michelin attempted to implement at Woodburn the same allegedly improper modifications to the working conditions that it had instituted in Alabama, without seeking approval by the International Union. Michelin attempted to get the local's approval of changes based on apparently high operating inefficiencies at the plant. Michelin allegedly threatened massive layoffs if the local did not approve the changes. The local refused.

On October 28, 1993 Michelin informed the International Union that it considered the Woodburn plant to be "distressed". According to the union, under the Uniform CBA this announcement required Michelin to "meet and confer" with union representatives to discuss increasing productivity at the plant. Although a "distressed" plant meeting was held on November 4, 1993, the union contends that Michelin did not participate in good faith because, although the union offered to meet higher productivity goals, Michelin refused the offer, stating that the only acceptable solution was for the union to approve all of its proposals.

According to the union, Michelin provided "almost no financial information whatsoever" in response to a request to substantiate the "distressed" status of the plant. In response Michelin contends that it offered financial records to the union, but the union wanted financial analysis of the effect of Michelin's proposals. At the November 4 meeting Michelin announced that it would issue a Notice of Plant Closure on November 9. On November 9 the notice was officially issued.

The union contends that the CBA requires Michelin to notify the union of a closure at least six months prior to the cessation of production operations. In addition the union argues that, under the CBA, Michelin is required to give the union a meaningful opportunity to discuss means of averting the closure and the manner in which closure is carried out. The union contends that Michelin has breached their negotiation obligation with respect to closure.

A meeting was held on November 30 during which Michelin allegedly notified the union that if its demands were not accepted by December 15 the decision to close the plant would become "irrevocable". In addition, Michelin informed the union that some machinery would be moved out of the plant over the Christmas holidays and corresponding layoffs would occur if the Michelin proposals were not accepted.

In October Local 715 filed grievances protesting a breach of the pension agreement. On December 6 Local 715 filed grievances protesting the "distressed plant" and the plant closure notices. Michelin has not processed these grievances nor, at the time the union filed suit, had the time expired within which Michelin was required to process these grievances.

### Preliminary Injunction Standard for Labor Disputes

■ The plaintiff's request for injunctive relief in the instant case conflicts with long-standing policies of federal labor law. The Norris–LaGuardia Act, 29 U.S.C. §§ 101–15, broadly prohibits federal courts from issuing injunctions in labor disputes thereby evidencing the strong federal policy against judicial interference with economic disputes between employers and employees. *See Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). The Supreme Court has created a narrow exception to this general prohibition where the involvement of the court is necessary to encourage and facilitate the voluntary resolution of labor disputes through arbitration. *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The party requesting injunctive relief under *Boys Markets* must establish that the collective bargaining agreement requires mandatory arbitration and that "ordinary principles of equity" are satisfied. 398 U.S. at 254, 90 S.Ct. at 1594 (citations omitted).

■ The Seventh Circuit has discussed the circumstances under which a union may obtain a status quo injunction against breach of a CBA by an employer. *International Ass'n of Machinists and Aerospace Workers v. Panoramic Corp.*, 668 F.2d 276 (7th Cir. 1981). Strict standards must be satisfied in order to issue the injunction. The court must determine that the employer's action "frustrates the arbitral process or deprives the union of an otherwise effective arbitral remedy." *Id.* at 282. The court further stated an injunction "is available, in aid of arbitration, where the underlying dispute is subject to mandatory arbitration under the labor contract and where an injunction is necessary to prevent arbitration from being a meaningless ritual." *Id.* at 283. In addition, the traditional requirements for equitable relief must be satisfied.

Additionally, the Seventh Circuit has outlined the actions that a district judge must take when generally considering a motion for preliminary injunction. *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir.1986).

(1) He must evaluate the traditional factors enumerated in the case law; whether there is an adequate remedy at law, a danger of irreparable harm, some likelihood of success on the merits. *See Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–88 (7th Cir.1984).

(2) He must make factual determinations on the basis of a fair interpretation of the evidence before the court.

(3) He must draw legal conclusions in accord with a principled application of the law.

*Id.* at 898. The court stated further that "the district court must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is

granted, and the wild card is the public interest." *Id.*

## A.) ARBITRABILITY

■ The threshold requirement under the *Boys Markets* analysis is whether the dispute is arbitrable under the CBA. Where the underlying dispute is not arbitrable, a *Boys Markets* injunction is not necessary to enforce the parties' promise to submit disputes to arbitration and is therefore unwarranted. *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 405–406, 96 S.Ct. 3141, 3147, 49 L.Ed.2d 1022 (1976). Here the dispute is multi-faceted: the union is contesting the changes implemented in Alabama, the lack of meaningful negotiation over the distressed status of the plant, lack of meaningful negotiation over alternatives to closure and pension disputes involving two employees. The parties agree on the arbitrability of all but one set of grievances: those concerning the validity of the Alabama modifications.

In support of their argument that this last set of grievances is arbitrable, the union has cited an analogous case which held that a dispute over changes made at an out-of-state plant was arbitrable. *Local 670, URW v. Armstrong Rubber,* 822 F.2d 613 (6th Cir. 1986). Although the union has presented the interesting question of whether the controversy regarding the validity of the Alabama modifications is arbitrable, resolution of this issue is not necessary to the analysis because the parties agree that the other disputes are arbitrable. The court expresses no opinion at this time as to the arbitrability of the Alabama contract disputes. Because the parties agree on the arbitrability of the other grievances, the court now continues to the next step of the status quo preliminary injunction analysis.

## B.) THE LIKELIHOOD OF SUCCESS

■ The union contends that in order for the plaintiff to establish a likelihood of success on the merits, the Seventh Circuit requires only a showing that the injunction is necessary to "prevent the frustration of the arbitration process". *Panoramic* at 284. The standard adopted by the Seventh Circuit is "the plaintiff ... need only establish that

the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor. If there is a genuine dispute with respect to an arbitrable issue" the requirement is met. *Panoramic* at 284–85. Satisfaction of this requirement depends upon whether the union's claims raise "sufficiently genuine disputes" to support a status quo injunction. *Id.* In making its determination the court is mindful that contract interpretation is not the function of the court, but is for the arbitrator. *Id.*

■ Applying this threshold standard to the present case the court finds that the union's claims meet this lowered standard. The evidence presented at the hearing raises a genuine dispute as to whether Michelin's conduct during the "distressed" plant and "closure" meetings satisfied the contract requirements to "meet and confer." The union's evidence established that Michelin implied that it would close the plant during the November 4 "distressed" plant meeting in which the parties were to discuss means of increasing productivity at the plant. This conduct raises a sufficient dispute as to whether Michelin satisfied its obligations to meet and confer under the contract.

## C.) IRREPARABLE HARM/INADEQUATE REMEDY AT LAW

In *Boys Markets* the Supreme Court stated that existence of actual or threatened irreparable injury is a prerequisite to an award of injunctive relief from employer breaches of collective bargaining agreements. *Panoramic* at 285 (citing *Boys Markets,* 398 U.S. at 254, 90 S.Ct. at 1594). As to irreparable injury, the union argues that the inquiry is "whether the arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party", citing *Panoramic* at 286.

The *Panoramic* case stated that a status quo injunction is appropriate when "the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration." *Id.* at 286. In *Panoramic* this standard was met because a sale of the plant was to take effect in two weeks; the buyer had announced that he would seek new employees for all plant jobs at that time and

therefore all current employees would be terminated. In addition, the buyer had already stated that he would not abide by the CBA. In analyzing the possibility of "frustration of arbitration" the court considered the future enforcement of possible remedies by an arbitrator. The court stated that it doubted the authority of an arbitrator to rescind the sale of the plant at a later date or to force the buyer, after the sale, to abide by the CBA. The court enjoined the sale because, if it hadn't, the arbitrator would not have been able to enforce reinstatement of the employees because the employer would no longer own a factory.

However, it is important to note that in *Panoramic* the Seventh Circuit approved the fact that the district court did *not* enjoin the discharge of the employees. The court stated that:

> [When an employee is laid off or terminated and is] awaiting a decision by the arbitrator on his grievance, an employee frequently suffers some [financial or emotional] injury that is not compensated by the contract remedies (in contrast to tort damages) typically awarded in arbitration. [citations omitted] *Although such injury is, in this sense, irreparable, it has never been understood to form the basis for injunctive relief against the employer.*

*Panoramic* at 286 n. 12 (emphasis added). The court further explained that the employees would not suffer irreparable harm if discharged by stating that "the discharged employees could obtain adequate relief in an arbitration proceeding." *Panoramic* at 288 n. 15.

The union initially argues that the irreparable injury requirement is satisfied here in two respects. First, the union argues that an unspecified number of employees may possibly be laid off losing compensation for some period of time. At the hearing, the union presented witnesses who testified that if they were laid off they would suffer severe financial hardship. Secondly, the union contends damages would be inadequate because the loss of jobs may be permanent. The union bases this argument on Michelin's statement that if their proposals were not accepted by December 15 the decision to close the plant will become irreversible. The union argues that Michelin must be enjoined from commencing plant closure activity pending arbitration because, if the closure procedures continue, an arbitrator's award of jobs will be too late to compensate the employees.

■ With respect to their first argument, the union contends that loss of compensation constitutes irreparable harm, citing *Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas R. Co.*, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960) ("*M–K–T*") and *Local 705, International Brotherhood of Teamsters v. Almarc Mfg., Inc.*, 553 F.Supp. 1170 (N.D.Ill.1982). The procedural posture of these two cases is significantly different from the case at hand; therefore the dicta extracted from these cases by the union is not applicable to the present situation. In *M–K–T* the court had issued an injunction against a strike of railroad employees and *as a condition* of issuing the injunction, the court required the company to reinstate discharged employees or pay them back wages. The court indicated that the conditions were the "price of relief" for invoking the injunctive power of the court. 363 U.S. at 531–32, 80 S.Ct. at 1329. In *Almarc* the arbitrator had already decided the grievance in the union's favor and had awarded reinstatement. The issue in the case was whether the award could be enforced pending resolution of a lawsuit contesting the arbitrator's award. In *Almarc* the procedural posture was significantly different from the present case where the arbitrator has not even heard the case yet.

In their supplemental brief, on this issue of irreparable harm, the union cites a previous decision of this court wherein the court enjoined an employer's termination of health benefits for four hundred (400) striking employees, holding that the harm suffered would be irreparable. *Chauffeurs, Teamsters and Helpers Local Union No. 414 v. Food Marketing Corp.*, 1986 WL 15724 (N.D.Ind.1986) (Lee, J.). The union also relies on *Lever Brothers* wherein the Fourth Circuit upheld an injunction restraining the employer from permanently moving plant operations to a different location. *Lever Bros. Co. v. Internat'l Chem. Workers Union, Lo-*

*cal 217*, 554 F.2d 115 (4th Cir.1976). As both of these cases are factually distinguishable from the present situation, the court does not find them controlling.

First, in *Food Marketing* the evidence showed that some employees "were foregoing medical treatment for various conditions." *Food Marketing* at \*7. In the present case, no similar evidence of employee lack of medical treatment was presented. In addition, in *Food Marketing* the employees' health benefits had actually been cut off. In the present case no evidence was presented of loss of medical coverage in the present or in the future, should lay offs take place. Secondly, *Lever Brothers* is clearly factually different from the present case. In *Lever Bros.* the company gave the employees two weeks notice of the plant closing. 554 F.2d at 118. Two weeks was clearly an inadequate period of time in which to resolve the dispute in an arbitration; the plant would have been closed for some period of time before the arbitrator decided the case. Here the situation is very different. The plant will not close prior to May 1994. In all likelihood the arbitration will be complete prior to the plant closing so an injunction is not necessary to keep the plant open.

The union has cited no cases holding that loss of compensation due to a lay off fulfills the requirement of irreparable harm warranting issuance of a preliminary injunction. Moreover, Michelin has cited and this court has found a number of Seventh Circuit cases holding that loss of compensation, regardless of how tragic the circumstances, does *not* constitute the legal element of "irreparable harm" required to warrant the extraordinary remedy of injunctive relief against an alleged employer CBA breach. *See Panoramic* at 286 n. 12; *Aluminum, Workers Local 215 v. Consolidated Aluminum Co.*, 696 F.2d 437 (6th Cir.1982); *Lasco v. Northern*, 733 F.2d 477, 481 (7th Cir.1981); *Ciechon v. City of Chicago*, 634 F.2d 1055, 1057 (7th Cir.1980); and *Chicago Typographical Union No. 116 v. Chicago Newspaper Publishers' Ass'n.*, 620 F.2d 602, 604 (7th Cir.1980). Therefore the court rejects the union's argument that possible loss of compensation satisfies the legal requirement of irreparable harm.

■ The union's second argument, that the loss of jobs is permanent and therefore irreparable, ignores the fact that Michelin does not intend to actually close the plant in December, but has stated that the plant will not close until May, 1994, in accordance with the CBA requirement of six months notice. Therefore the present situation is far different from the cases cited by the union wherein the loss of jobs was in fact permanent because the plant was going to be sold or closed immediately. *See Panoramic* at 286; *Brotherhood Railway Carmen Div. v. Green Bay and Western Railroad Co.*, 801 F.Supp. 231, 237 (E.D.Wis.1992); and *Lever Brothers Co. v. Intern'l Chem. Workers Union, Local 217*, 554 F.2d 115 (4th Cir.1978). This type of truly irreversible, permanent loss of jobs does satisfy the requirement of irreparable harm; however in the present case the loss of jobs is not irreversible and therefore not permanent. Michelin will keep this plant open at least until May 1994 and will be operating other plants within the United States as well. In addition, Michelin has stated that they plan to remove approximately forty (40) curing presses from the plant in the near future. However, the evidence presented at trial established that approximately twenty-eight (28) of these presses are currently sitting idle and that over 150 of these presses will remain in use at the plant. Should Michelin not be enjoined from removing this equipment, the disruption at the plant will be minimal and the loss of jobs related to the equipment removal is merely speculative. Moreover, if the union wins in arbitration, Michelin will have the power to reinstate any employees should an arbitrator order this relief.

In addition, the union argues that, once equipment is moved out, the plant closure process will become irrevocable and an arbitrator's award of reinstatement or order to reopen the plant will be meaningless. However, the evidence at the hearing established that the "irrevocability" of the decision to close the plant is merely a meaningless posturing position employed by the parties in their continuing efforts to frustrate the negotiations of the tough productivity issues at the heart of this controversy. The plant

closure may be reversed by an arbitrator, if he decides in favor of the union, and the union has not shown that an award such as this in their favor will be "empty".

Moreover, Michelin has stated on the record that it will "proceed with due diligence to work with the [union]" and expedite the arbitration process. In addition, Michelin has stated that it will comply with any order to return equipment to the Woodburn plant and any award of reinstatement ordered by the arbitrator. Although some may regard Michelin's statement as self-serving, the court notes that it will retain jurisdiction over the parties and may enforce an arbitrator's award, if necessary. As long as the arbitrator decides the disputes while the plant is still owned by Michelin, a possible arbitrator's award of jobs plus backpay for laid off employees may be fully effectuated.

■ At the hearing and in their supplemental brief, the union presented two additional bases for finding the requisite irreparable harm. First, the union argues that, under the contract, laid off employees have a right to bid for jobs at other plants that must be exercised within forty-five days or else forfeited. They argue that laid off employees may be forced to uproot their families to remain employed and then, if the plant is reopened in Woodburn, the employees would have to decide whether to bid for jobs in Woodburn within ten days and then move again. However, nowhere does the union mention that the preferential rights described are a matter of contract between the parties. The parties have decided, certainly after extensive analysis, that these would be the acceptable terms of their agreement with respect to laid off employees. The court will not rewrite the parties' agreement for them and the parties will be bound to their agreement. *Drivers, Chauffeurs v. Akers Motor Lines*, 582 F.2d 1336, 1343 (4th Cir.1978).

Second, the union argues that, should the arbitrator decide in favor of the union and require the company to go through the closure negotiations again, the union will be in "the exact factual situation faced" in *Lever Bros.* of having to change the company's mind regarding its decision to close the plant and move the operations elsewhere. As dis-

cussed *supra*, the present situation is not the same as that in *Lever Bros.* In addition, as the court has stated at the hearing, this court does not have the power to enjoin the company's state of mind regarding closure. Therefore the court rejects the unions additional arguments regarding irreparable harm and finds that the union has failed to establish the irreparable injury required to warrant a *Boys Markets* injunction.

## D.) BALANCE OF HARDSHIPS

■ The Seventh Circuit has stated that the "final equitable prerequisite to the issuance of a status quo injunction is a finding that the union will suffer more from the denial of an injunction than will the employer from its issuance." *Panoramic* at 288.

With regard to hardship, the union contends that its members are faced with the prospect of permanent loss of employment because if the Woodburn plant closes they will lose their jobs. The union argues that Michelin is faced only with "the temporary abatement of further implementation of changes which it only very recently 'decided' were necessary." The union argues that Michelin's possible defense of loss of cost efficiency in the event the injunction issues, is insufficient to deny an injunction.

The union's claim of permanent loss of jobs is overstated with respect to the legal standards for injunctive relief. As stated *supra*, the union has failed to show that they face a permanent loss of jobs if the status quo at the Michelin plant is not maintained pending arbitration. Michelin has stated at the hearing that they will not close the plant prior to May 1994 and will also proceed with all due diligence to complete the arbitration process by that time. Therefore the possible loss of jobs resulting from removal of an insignificant amount of equipment is not permanent because an arbitrator may enforce an award of reinstatement prior to the plant closing if the union is successful in arbitration.

Focusing on the hardship to the union *in the event the injunction is not issued,* the union may suffer merely a temporary loss of some jobs, assuming they win their case in arbitration. The claim of permanent loss of

**606**

jobs at this time is simply untrue, as discussed *supra*. However if the injunction is issued, Michelin will suffer a temporary delay in implementation of management directives. Although Michelin has not shown substantial hardship if the injunction is issued, the union has also failed to show any significant hardship if the injunction does not issue. The union has not satisfied their burden of showing the balance of hardships tips in their favor.

### E.) ARBITRATION PROCESS

 With respect to the union's request that the court order Michelin to arbitrate, the court notes initially that the union has failed to establish that Michelin is resisting arbitration. In fact, the contrary has been shown by Michelin. At the hearing, witnesses testified that both parties have been participating in the established process of selecting an arbitrator. In addition, on the facts presented to the court there is also no basis for expediting arbitration. Both parties have expressed a willingness to proceed expediently with the arbitration process. Michelin has stated on the record that they will be ready to commence with the actual arbitration no later than March 1, 1994. The parties have agreed to select an arbitrator who is willing and able to proceed on an expedited basis. Moreover, Michelin has stated that it will not close the plant prior to May; clearly, an arbitrator proceeding on an expedited basis would have the time to render his decision prior to the plant closing date. Because the parties are voluntarily proceeding with expedited arbitration, there is simply no need for the court to intercede on behalf of the union to order expedited action. Therefore, based on the foregoing, the court denies the plaintiff's request to order or expedite arbitration.

#### Conclusion

For the foregoing reasons, the plaintiff's motion for a status quo injunction enjoining equipment removal or plant closure activities is DENIED. Similarly, the plaintiff's motion to compel arbitration or to expedite the arbitration process is DENIED. However, insofar as future events may indicate that arbitration is not proceeding on the timeframe discussed *supra*, the court notes that it will entertain any further motions by the parties directed to that issue.