**LOCAL 715, UNITED RUBBER, CORK, LINOLEUM AND PLASTIC WORKERS OF AMERICA and International Union of United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, Plaintiffs,**

v.

**MICHELIN AMERICA SMALL TIRE f/k/a Uniroyal Goodrich Tire Company A wholly owned subsidiary of Groupe des Establishments Michelin, Defendant.**

No. 1:93–CV–324.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

April 13, 1994.

Ralph R. Blume, Blume Connelly Jordan Stucky and Ulmer, Fort Wayne, IN, Craig D. Doyle, Gene R. Leeuw, Joseph W. Murphy, Klineman Rose Wolf and Wallack, Indianapolis, IN, Larry J. Burke, Fort Wayne, IN, for Local 715 United Rubber, Cork, Linoleum and Plastic Workers of America.

Craig D. Doyle, Gene R. Leeuw, Joseph W. Murphy, Klineman, Rose, Wolf and Wallack, Indianapolis, IN, Larry J. Burke, Fort Wayne, IN, Charles R. Armstrong, Carolyn T. Wonders, Akron, OH, for International Union of. URW, AFL–CIO–CLC.

J. Michael O'Hara, Thomas M. Kimbrough, Barrett and McNagny, Fort Wayne, IN, Steve Nail, Legal Dept., Greenville, SC, Harley M. Kastner, David P. Hiller, Millisor and Nobil, Cleveland, OH, for Michelin America Small Tire.

Joseph W. Shull, Fort Wayne, IN, for Joseph Shull.

Herbert C. Snyder, Jr., Barnes and Thornburg, Fort Wayne, IN, for Herbert Snyder.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on defendant's Motion for Enforcement of Settlement Agreement. For the following reasons, defendant's Motion is granted.

### STATEMENT OF THE CASE

Defendant filed its Motion for Enforcement of Settlement Agreement on March 15, 1994 with a supporting memorandum, exhibit and Affidavit of Steven E. Nail, Assistant General Counsel of the Uniroyal Goodrich Tire Company (hereinafter: "the Company").

On March 24, 1994, plaintiff, the International Union of United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO (hereinafter: "the International"), filed the Affidavit of Glenn Ellison, Secretary-Treasurer of the International, and two exhibits. The exhibit marked "A" attached to the affidavit is a copy of the current constitution of the International. The exhibit marked "B" attached to the affidavit is a copy of the decision of the International's Executive Board issued March 1, 1994 concerning the intra-union appeal of the leadership of Local 715, United Rubber, Cork, Linoleum and Plastic Workers of America (hereinafter: "Local 715") initiated by Local 715 President, Ray Wiseman. The appeal concerned the action taken by the International President in conducting a vote of the membership of Local 715 to determine whether the membership wished to accept the Settlement Agreement or the "final offer" of the Company.

Plaintiff, Local 715, or the leadership of Local 715, *see, infra* filed its Brief in opposition to the enforcement of the Settlement Agreement on March 25, 1994. On March 29, 1994, the International filed its Memorandum in Support of Defendant's Motion for Enforcement of Settlement Agreement, and the Company filed its Reply Brief in Support of Motion to Enforce Settlement Agreement on the same date.

On March 30, 1994, the court held a hearing on the matter, took additional evidence and listened to the arguments of counsel. At the conclusion of the hearing, the court took the matter under advisement. Subsequent to the hearing, the leadership of Local 715 submitted a copy of videotapes of the informational meetings conducted by the International on February 12, 1994 into evidence, which the court viewed in chambers. The court now issues the following Order enforcing the Settlement Agreement.

### FACTUAL BACKGROUND

The factual background surrounding the general dispute between the Company, the International and Local 715 is thoroughly addressed in the previous Orders of this court. *See, Local 715, United Rubber, Cork, Linoleum and Plastic Workers of America v. Michelin America Small Tire,* 840 F.Supp. 595 (N.D.Ind.1993); *Local 715 v. Michelin America Small Tire,* 840 F.Supp. 598 (N.D.Ind.1993); *Local 715 v. Michelin America Small Tire,* 848 F.Supp. 1397 (N.D.Ind. 1994). However, a quick review of the facts essential to the instant matter is necessary.

On February 9, 1994, the court conducted a hearing at the behest of the International. The International President, pursuant to the powers granted him by the International's constitution, had decided to call an informational meeting of the membership of Local 715 on February 12, 1994, and at the conclusion of that meeting to call a vote of the membership upon the "final offer" of the Company. The "final offer" of the Company

was the product of lengthy negotiations between the parties and is the Settlement Agreement (hereinafter: "the Agreement") that the Company now wishes for this court to enforce. The International had decided to call a vote upon the Agreement because Local 715 President Ray Wiseman would not submit the Agreement to the membership for a vote. Indeed, at the hearing of February 9, 1994, Mr. Wiseman indicated in open court that he would not submit the Agreement to a vote of the membership.

The International requested the court to appoint two (2) Special Masters to oversee the conduct of a secret ballot vote of the membership and to provide deputy United States Marshals so that the membership could freely vote in a secure and orderly fashion. The court agreed to provide this limited assistance to the International. *Local 715*, 848 F.Supp. 1397.

The membership voted to accept the Agreement by a vote of 1007 to 411. The Agreement states by its own terms that it becomes effective once it is ratified and approved by three bodies: (1) the Company's Policy Committee, (2) a majority of the Locals representing a majority of the members, and (3) the International Executive Board. All of these bodies have approved the Agreement.

However, Mr. Wiseman and other officers of Local 715 refuse to abide by some of the terms of the Agreement. Specifically, they refuse to drop twelve (12) grievances filed in connection with the conduct of the Company and its relationship with other Locals of the United Rubber, Cork, Linoleum and Plastic Workers of America located in Alabama. They refuse to withdraw unfair labor practice charges (Case 25–CA–22960) filed with the National Labor Relations Board. They also refuse to dismiss two other associated lawsuits in the federal district courts of Alabama (No. 93–C–2217–W (N.D.Ala.1993) and No.

93–D–1213–E (M.D.Ala.1993)). The Agreement that was approved by the membership of Local 715 on February 12, 1994 recites that these various matters would all be withdrawn by Local 715.[1]

## DISCUSSION

### The Parties' Contentions

The Company asserts that because of Mr. Wiseman's actions, it was compelled to file its Motion for Enforcement of Settlement requesting this court to order Mr. Wiseman and the other officers of Local 715 to abide by all of the terms of the Agreement and to order them to take affirmative action to dismiss or withdraw the various grievances, unfair labor practice charges and associated lawsuits covered by the Agreement. The Company states that if Mr. Wiseman is not ordered to abide by the terms of the Agreement, the Company will not receive the benefit of its bargain.

Local 715 President Ray Wiseman and other officers of the Local allege that Local 715 is not bound by the Agreement as it was secured in an infirm manner. Specifically, Mr. Wiseman and the other officers assert the Company committed unfair labor practices in securing the approval of the membership for the Agreement in that the Company failed to bargain with the exclusive bargaining representative of the membership of Local 715, the elected officers of Local 715, and instead bargained directly with the membership of Local 715. Mr. Wiseman and the other officers also assert the International cannot act as the exclusive bargaining representative for the membership of Local 715, and therefore, the Company failed to bargain with the exclusive bargaining representative when the Company reached an agreement with the International.

They also contend that the International President exceeded his authority by calling

---

1. The court notes that the leadership of Local 715 has decided to abide by some of the other terms of the Agreement, and that Local 715 is presently enjoying benefits of the Agreement even though Mr. Wiseman and the other officers do not wish for Local 715 to be bound by the terms of the Agreement that call for the dismissal of the various grievances, unfair labor practice charges, and associated lawsuits. For example, the Agreement provides for an early retirement package for members of Local 715 who meet certain eligibility requirements. At the March 30, 1994 hearing, the Company represented to the court that it has already begun to pay out early retirement benefits to eligible members under the Agreement.

for a vote upon the Agreement. They acknowledge the International President has the authority to call and preside at special meetings of Local 715, but they assert he does not have the authority to call for a vote by the membership upon a contract proposal.

The leadership of Local 715 also asserts that the International made misrepresentations to the membership as to the terms of the Agreement at the informational meetings held on February 12, 1994. In support of this particular argument, they submitted two video tapes of the informational meetings into evidence subsequent to the conclusion of the hearing held on March 30, 1994, which the court then viewed in chambers.

Finally, the leadership of Local 715 maintains that the action taken by the International President in calling for a vote of the membership of Local 715 was in essence the imposition of a trusteeship, and that the manner in which the trusteeship was imposed upon Local 715 violated the constitution of the International and also violated the Labor–Management Reporting and Disclosure Act of 1959, (LMRDA) 29 U.S.C. § 401 et seq.

The International asserts the Agreement should be enforced by this court. The International argues that the characterization by the leadership of Local 715 of the events which lead up to the membership approving the Agreement to be an unfair labor practice because the Company bargained directly with the employees is incorrect. The principal argument advanced by the International on this point is that the International was the bargaining representative of the Local membership once the International President decided to call for a vote upon the Agreement.

The International also insists that its President had the authority under its constitution not only to call a special meeting of the membership of Local 715, but also to call for a vote on the Agreement. The International asserts that its interpretation of its own constitution is the correct interpretation, and that the correct interpretation leads to the conclusion the International had the authority to call the vote of the membership. In fact, Local 715 President Ray Wiseman appealed the decision of the International President to submit the Agreement to a vote of the membership to the International's Executive Board arguing the International President lacked the authority to do so. However, the International Board determined the International President did have the authority to submit the Agreement to the membership. See, Exhibit B, filed with the Affidavit of Glenn Ellison, the Secretary–Treasurer of the International.

The International maintains that the interpretation of the International's constitution and Local 715's bylaws by Local 715's leadership is incorrect in that neither document confers upon the Local leadership the right to withhold a contract proposal from submission to the membership. The International contends the Local leadership incorrectly believes it has what is essentially a veto power over potential contracts despite the will of its membership or the will of the International.

Finally, the International contends that the limited action it took in order to effectuate a vote of the membership on the Agreement did not constitute a trusteeship either under its constitution or under the LMRDA, 29 U.S.C. § 401 et seq. The International states that it did not exercise control or supervision over Local 715. To the contrary, the International asserts that it empowered the membership of Local 715 to decide a question of paramount interest and that the membership remained free at all times to decide whether to accept or reject the Agreement.

### The Court has the Authority to Enforce the Agreement

■ The court has jurisdiction over this matter by virtue of Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185, and by 28 U.S.C. § 1337. 28 U.S.C. § 1337 states, "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." Id. It has been held that an action commenced pursuant to 29 U.S.C. § 185 relating to suits by and against labor organizations invokes the origi-

nal jurisdiction grant of 28 U.S.C. § 1337. *See, Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968); *See also, Textile Workers Union of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *LaBuhn v. Bulkmatic Transport Co.,* 865 F.2d 119 (7th Cir.1988).

The jurisdictional grant of Congress cited in 29 U.S.C. § 185 and 28 U.S.C. § 1337 extends to include intra-union disputes. The constitution of the International represents a contract between the International and Local 715. *See, United Ass'n of Journeymen, Etc. v. Local 334, Etc.,* 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981). As the constitution of the International represents a contract with Local 715, the jurisdiction of the court is invoked pursuant to 29 U.S.C. § 185, and the court may resolve the dispute between the International and Local 715. *Id.* The applicable law to be applied is federal substantive law. *Id.*

The court has continually retained jurisdiction is this matter. There has been no Order of Dismissal entered in this case. Therefore, if the parties have mutually agreed to a settlement agreement, the court has the authority to enforce the terms of that agreement. *McCall–Bey v. Franzen,* 777 F.2d 1178, 1187 (7th Cir.1985); *Cummins Diesel Michigan, Inc. v. The Falcon,* 305 F.2d 721, 723 (7th Cir.1962). The International and the Company both represent to the court that by the Agreement's own terms, and in conformity with the International's constitution, all of the steps necessary to ratify and approve the Agreement have been met. The Company's Policy Committee has approved the Agreement, it has been approved by a majority of the Locals representing a majority of the members of the Locals, and it has been approved by the International Executive Board.

The only stumbling block to fully [2] implementing the Agreement is the refusal of the leadership of Local 715 to dismiss or withdraw the various grievances, unfair labor practice charges and associated lawsuits as required by the terms of the Agreement. The leadership of Local 715 refuses to dismiss these various matters because they believe the Agreement became operative in violation of the Uniform Agreement dated May 3, 1991, executed by the International, its various Locals, and the Company, the International's constitution, and in violation of federal labor law. However, as the court shall fully discuss *infra*, such is not the case.

Thus, because the parties have mutually agreed to the Agreement as evidenced by the approval and ratification process undertaken by all the parties to the lawsuit, the court shall enforce the terms of the Agreement.

### The Company Bargained with the Exclusive Bargaining Representative

The leadership of Local 715 argues that "[t]he sole and exclusive bargaining agent for the production and maintenance employees for defendant's Fort Wayne plant location is Local 715, and that this is established in the Uniform Agreement dated May 3, 1991, between the parties in Article II, Recognition, Section 1, Exhibit A." Brief of Plaintiff Local 715 at Unnumbered p. 3. The leadership of Local 715 also asserts that the International had no authority to act for Local 715 as its bargaining agent, and thus, had no authority to enter into an agreement with the Company. The leadership of Local 715 further contends the International misrepresented the terms of the Agreement to the membership of Local 715 at the informational meetings held on February 12, 1994. Finally, the leadership of Local 715 argues the Company committed unfair labor practices by dealing directly with the membership of Local 715, instead of bargaining with the exclusive bargaining agent, the leadership of Local 715.

The court finds these arguments without basis in fact. The Uniform Agreement is an agreement between the Company, the various Locals, including Local 715, and the International. All of these parties are signatories to the Uniform Agreement. Moreover, the Uniform Agreement clearly does not

---

**2.** *See, supra* n. 1.

state that the leadership of Local 715, or Local 715, is the exclusive bargaining representative for Local 715. The Preamble to the Uniform Agreement states:

THIS AGREEMENT, made and entered into this *3rd day of May, 1991*, by and between The Uniroyal Goodrich Tire Company for its plants located in Eau Claire, WI; Fort Wayne, IN; Opelika, AL; and Tuscaloosa, AL; hereinafter referred to as the "Company," and The International Union of the United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO–CLC, Akron, OH and the Local Unions thereof; namely, Local Union No. 19, Eau Claire, WI; Local Union No. 715, Fort Wayne, IN; Local Union No. 753, Opelika, AL; and Local Union No. 351, Tuscaloosa, AL; hereinafter referred to as the "Union," acting as the sole and exclusive bargaining agent for the production and maintenance employees in said plant locations.

Furthermore, Article II, Recognition, Section 1, Paragraph (a) provides in pertinent part:

The Company recognizes the Union as the sole and exclusive collective bargaining agent for all production and maintenance employees in the respective plants enumerated in the Preamble of this agreement
. . .

The "Union", as defined by the Preamble, is the respective Local Unions and the International. The Recognition section quoted *supra* defines the sole and exclusive bargaining representative as "the Union." Thus, by the terms of the Uniform Agreement itself, both Local 715 and the International are "the Union", and both constitute the exclusive bargaining representative of the membership of Local 715. Accordingly, the International had the authority to bargain with the Company.

■ In support of its argument that the International made misrepresentations to the membership of Local 715 at the informational meetings held on February 12, 1994, and therefore, Local 715 cannot be held bound to the Agreement, the leadership of Local 715 submitted into evidence a videotape of the events of the morning meeting and also submitted a videotape of the events of the after-

noon meeting. The court painstakingly viewed both videos in their entirety carefully watching for any misrepresentations made by the International during its presentation of the Agreement to the membership of Local 715. The court was unable to detect any misrepresentations.

However, several facts are apparent from the videotapes. First, the International did not force the membership of Local 715 to accept the Agreement. Many times during the morning meeting and during the afternoon meeting, the Vice President of the International explained to the membership of Local 715 that the International was only conducting an informational meeting and that the International was not there to "sell" the Agreement to the membership. The International Vice President further stated the only reason the International was conducting the meeting and the vote was to ensure that the membership was involved in the process of determining whether they wished to accept or decline what the International believed to the Company's "final offer" as the leadership of Local 715 had never allowed the membership the opportunity to pass on the Agreement. The International Vice President also stated that he thought the Agreement was not a good Agreement, and if the membership also believed strongly that the Agreement was not a good agreement, they should vote it down.

Second, the videotapes demonstrate the membership understood that if they accepted the Agreement, the various grievances, unfair labor practice charges and the associated lawsuits filed in Alabama would all be dismissed. Notwithstanding the somewhat cryptic explanation given by the International Vice President concerning the matters regarding the Fort Wayne plant in one of his many discussions concerning these various "legal" matters, several of the membership who spoke out at both of the meetings clearly understood, and thus imparted their understanding to other members when they spoke out, that the various grievances, unfair labor practice charges and associated lawsuits were to be dismissed if the Agreement was approved by the membership. Ray Wiseman attended both meetings and also explained to

the membership that the Agreement called for all of these various matters to be dismissed if the Agreement was approved.

Finally, the videotapes indicate that Ray Wiseman took the opportunity to speak to the membership as to the specific terms of the Agreement. At both meetings Ray Wiseman spelled out various changes between the Agreement and the previous collective bargaining agreement which covered the Fort Wayne plant. He also spoke to the differences in the Agreement relative to the other new collective bargaining agreements the Company had just executed with its two other tire plants located in Alabama where the International and the respective Locals had represented the membership. Furthermore, Ray Wiseman indicated to the membership that he thought the Agreement was a bad agreement and that the Local leadership could still bargain for a better agreement, although he did not tell the membership not to vote on the Agreement.

Clearly, had any misrepresentations been made by the International at the informational meetings, Ray Wiseman and the other officers of Local 715 had the opportunity to point out to the membership the misrepresentations at the times they were made. Ray Wiseman spoke to the membership many times during the informational meetings. The court is unable to detect any misrepresentations made by the International. Moreover, after viewing the videotapes, the court is convinced now more than ever that the International conducted an informational meeting in which it did not advocate for or against the Agreement, but that it merely asked the membership one simple question that it had not previously been allowed to answer; whether it wished to accept or decline the Agreement offered by the Company.

■ Finally, the court holds that it is without jurisdiction to determine whether the Company has committed any unfair labor practices against the International or Local 715 in the process of securing the Agreement. State and federal courts are without jurisdiction to entertain matters that involve allegations of unfair labor practices under the National Labor Relations Act, 29 U.S.C. § 158. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959); *Kolentus v. Avco Corp.*, 798 F.2d 949, 961 (7th Cir.1986), *cert. denied*, 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987). Such matters fall under the exclusive jurisdiction of the National Labor Relations Board. *Kolentus*, 798 F.2d at 961. Moreover, whether the Company committed any unfair labor practices during the course of securing the Agreement does not bear upon the matter presently before the court, that is, whether the parties have mutually reached a settlement agreement. The issue of whether unfair labor practices were committed in the course of seeking the approval of the Agreement from the membership must be saved for another day before another tribunal, the National Labor Relations Board.

### *The International had the Authority to Call the Vote*

■ The International President had the authority to call the vote of the membership of Local 715 pursuant to his authority under the International's constitution. The International President interpreted the constitution to impart upon him the authority to call for the vote, and the International Executive Board also determined that the International's constitution gave him this authority.[3] Where a union's interpretation of its own constitution is not unreasonable, federal courts must defer to the union's interpretation. *Maher v. Int'l Bhd. of Elec. Workers*, 15 F.3d 711, 714 (7th Cir.1994); *Air Wisconsin Pilots Protection Com. v. Sanderson*, 909 F.2d 213, 218 (7th Cir.1990), *cert. denied*, 498 U.S. 1085, 111 S.Ct. 958, 112 L.Ed.2d 1045 (1991); *Local Union No. 657 v. Sidell*, 552 F.2d 1250, 1256 (7th Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977). "[A] union's interpretation of its own consti-

---

**3.** Article IV, Section 3, Paragraph (d) of the International's constitution states in pertinent part "The International President shall decide all questions of law, disputes or questions in contro-versy however arising, ... all his/her decisions being subject to appeal, first to the International Executive Board and then to the Convention."

tution, bylaws, and other promulgations is entitled to judicial deference; we must be able to call the interpretation unreasonable, perhaps even 'patently unreasonable,' before we can set it aside." *Air Wisconsin*, 909 F.2d at 218 (quoting *Sidell*, 552 F.2d at 1257). The underlying purpose for this deference to the union's interpretation of its own constitution is clear. There is a national federal policy against judicial intervention into internal union affairs. *Sidell*, 552 F.2d at 1254.[4]

The International President called the informational meeting and the vote by the membership on February 12, 1994 pursuant to Article IV, Section 3, Paragraph (e) of the International's constitution which states in pertinent part:

> The International President shall have authority to call and/or preside at special meetings of Local Unions whenever he/she deems such meetings necessary to protect the interests of the organization. When such a meeting is called, the membership and the officers of the Local Union will be given at least forty-eight (48) hours notice.

The International President and the International Executive Board interpreted this section to confer upon the International President the authority to take corrective action at special meetings. *See*, Exhibit B, filed with the Affidavit of Glenn Ellison, the Secretary–Treasurer of the International. The International concluded that without such incidental powers to act, the grant of authority under this subsection would be illusory. *Id.*

The International Executive Board also determined that the action taken by the International President by calling for a vote by the membership of Local 715 was not only in accordance with the International's constitution, but also in accordance with Local 715's bylaws. The leadership of Local 715, in the

eyes of the International, was exercising essentially what amounted to a veto power by not submitting the Agreement to the membership for a vote for possible ratification. The International determined that the leadership of Local 715 had no such power under either its bylaws or the International's constitution.

Article VI, Section 6, paragraph (A) of the bylaws of Local 715 states "[The Bargaining] Committee shall consist of the Local Union President and four (4) members elected by and from the Local Union membership." Paragraph (b) of the same Section reads, "This Committee shall negotiate all contracts or agreements between the Local Union and the Uniroyal Goodrich Tire Company which the Local Union has authorized. Such contracts or agreements shall be submitted for approval or disapproval of the Local Union membership and the International Union, as prescribed by the URW Constitution."

The International Executive Committee found the language *supra* to empower the membership to authorize the Bargaining Committee to engage in negotiations, but to leave the ultimate decision of whether to approve or disapprove the Agreement to the membership of Local 715. Thus, the International Executive Committee held that the decision of the International President to call a vote on the Agreement to be in harmony with the bylaws of Local 715.[5] *See*, Exhibit B, filed with the Affidavit of Glenn Ellison, the Secretary–Treasurer of the International.

The interpretation by the International President and the International Executive Board of the International's constitution and the bylaws of Local 715 is in sharp contrast to the interpretation of those documents by the leadership of Local 715. However, not only do the sections of the International's constitution listed at footnote number five (5)

---

4. "The reason [for this deference to the union's interpretation] is to protect the internal affairs of unions from heavy-handed judicial interference, and is consistent with what has become in the last half century a settled though not total aversion to federal judicial intervention in labor relations." *Air Wisconsin*, 909 F.2d at 218.

5. The International President or the International Executive Board could have also determined

that the bylaws of Local 715 conflicted with the International's constitution requiring the bylaws of Local 715 to yield to the supremacy of the International's constitution, thereby reaching the same result that the International President had the authority to call the vote. Article III, Section 1, Paragraph (a) and Article IV, Section 1, Paragraph (c) of the International's Constitution.

provide a basis to support the International's interpretation, but Article VIII, Section 7, Paragraph (a) also provides another basis for deferring to and upholding the International's interpretation. That section states:

The President of a Local Union shall be held responsible by the International Union for the strict enforcement of this Constitution, the established policies of the International Union, the Bylaws of the Local Union and the collective bargaining agreements between the employer and the Local Union of which he/she is an officer. Except as otherwise provided in this Constitution the decisions and interpretations of the President of the Local Union shall apply unless reversed or modified by the Local Union Executive Board, the membership of the Local Union, or the International Union.

From the facts of the present case, it can be argued that Local 715 President Ray Wiseman's interpretation of the International's constitution and the bylaws of Local 715 has been reversed or modified not only by the International Union, but also by the membership of Local 715 where the membership voted to accept the Agreement.

In any event, the court does not find the interpretation of the International's constitution and the bylaws of Local 715 by the International to be so patently unreasonable that this court should disturb the decision of the International. The court shall defer to the decision of the International regarding intra-union governance in accordance with the national federal policy against judicial intervention into internal union affairs.

### No Trusteeship Was Imposed

 The final argument of the leadership of Local 715 that the Agreement should not be enforced is that the International imposed a trusteeship upon Local 715 when it conducted the vote on February 12, 1994, in violation of the International's constitution and the LMRDA, 29 U.S.C. § 401 *et seq.* The court holds that no trusteeship was ever imposed upon Local 715, either legally or illegally.

A separate basis, other than the statutes empowering this court with subject-matter jurisdiction *supra,* exists for this court to exercise subject-matter jurisdiction over this particular argument of the leadership of Local 715. Because the leadership of Local 715 asserts the International wrongly imposed a trusteeship over Local 715, the leadership has invoked this court's jurisdiction under the LMRDA, 29 U.S.C. § 464, which states in pertinent part:

Any member of subordinate body of a labor organization affected by any violation of this subchapter (except section 461 of this title) may bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate.

*Id.; see also, Vestal v. Hoffa,* 329 F.Supp. 801, 805–06 (M.D.Tenn.) (holding that individual members of a local union could sue the international union for the wrongful imposition of a trusteeship), *rev'd on other grounds,* 451 F.2d 706 (6th Cir.1971). Thus, this court has subject-matter jurisdiction over this particular claim.

Congress enacted the LMRDA, 29 U.S.C. § 410 *et seq.,* because it determined further legislation was required that would "afford [the] necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives." 29 U.S.C. § 401(b). The legislative history indicates Congress sought to ensure democratic processes within labor organizations:

The internal problems currently facing our labor unions are bound up with a substantial public interest. Under the National Labor Relations Act and the Railway Labor Act, a labor organization has vast responsibility for economic welfare of the individual members whom it represents. Union members have a vital interest, therefore, in the policies and conduct of union affairs. To the extent that union procedures are democratic they permit the individual to share in the formulation of union policy. This is not to say that in order to have democratically responsive unions, it is necessary to have each union

member make decisions on detail as in a New England town meeting. What is required is the opportunity to influence policy and leadership by free and periodic elections.

S.Rep. No. 187, 86th Cong., 1st Sess. pt. 2 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2323.

A myriad of courts have also discussed the policy considerations that compelled Congress to enact the LMRDA. The most widely cited reason why Congress enacted the LMRDA was that Congress wished to reenforce the conviction that unions are to be democratic institutions. In discussing Title IV (Elections) of the LMRDA, and the legality of facially reasonable union rules that had anti-democratic effects, the Supreme Court of the United States held:

Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member. The goal was to protect the rights of rank and file members to participate fully in the operation of their union through processes of democratic self-government, and through the election process, to keep the union leadership responsive to the membership ... Congress was not concerned only with corrupt union leadership. Congress chose the goal of free and democratic union elections as a preventative measure to curb the possibility of abuse by benevolent as well as malevolent entrenched leadership.

*Local 3489, United Steelworkers of America v. Usery,* 429 U.S. 305, 309, 97 S.Ct. 611, 614–15, 50 L.Ed.2d 502 (1977) (citations omitted).

Other courts have also determined that Congress' intent in adopting the LMRDA was to ensure democratic processes within labor organizations. In discussing Title I (Bill of Rights of Members of Labor Organizations) of the LMRDA, Judge Aguilar held that by enacting the LMRDA Congress created "a statutory basis for ensuring the existence of union democracy." *See, Turner v. Demptser,* 569 F.Supp. 683, 691 (N.D.Cal. 1983), *aff'd,* 743 F.2d 1301 (9th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1361, 84 L.Ed.2d 382 (1985). The democracy envisioned by Congress consists of two (2) complementary ideas. First, union democracy means that union leaders may not dictate the actions of the union without observing the preferences of the membership. Second, the voting rights of the membership would be preserved and the membership would participate fully in the affairs of the union. *Turner,* 569 F.Supp. at 691.

Focusing on Title I of the LMRDA Judge Decker held, "[t]he essential purpose of the [LMRDA] was to broaden, not constrict, democratic safeguards for union members." *Graham v. Soloner,* 220 F.Supp. 711, 714 (E.D.Pa.1963).

Furthermore, interpreting the policy behind Title I and Title V (Safeguards For Labor Organizations) of the LMRDA, Judge Walinski held that it was the clear intention of Congress that members of labor organizations should "have the right to full and active participation in the affairs of the union." *Blanchard v. Johnson,* 388 F.Supp. 208, 213 (N.D.Ohio 1975), *modified,* 532 F.2d 1074 (6th Cir.), *cert. denied,* 429 U.S. 869, 97 S.Ct. 180, 50 L.Ed.2d 149 (1976). Stemming from this overall policy concern, the learned judge further held that because the LMRDA guarantees the right to vote in union affairs, the LMRDA must be interpreted to guarantee a meaningful vote. *Id.* Without a meaningful vote where the membership is informed as to the matter being voted upon, the vote is only a "shot in the dark." *Id.* at 214. Thus, the court concluded:

Since this policy underlies all of the LMRDA, the duties created in § 501(a) must include the duty to keep the membership informed on matters which they, the rank and file, must decide ... It is the duty of the union leadership under § 501, as fiduciaries, to see that the lines of communication and dissemination of views and opinions are kept open and working, especially as to matters on which members will be asked to vote.

*Id.*

■ Finally, in *Vestal v. Hoffa,* 329 F.Supp. 801 (M.D.Tenn.1971), Judge Morton held that Congress enacted Title III (Trusteeships) of the LMRDA to establish restric-

tions on the ability of parent labor organizations to place local unions under a trusteeship. *Id.* at 806. Such restrictions were needed to curb widespread abuse of the device which had resulted in the local membership effectively being shut out of the decision-making process on matters concerning the operation of the local union. *Id.* In discussing the correct approach of interpretation of Title III, Judge Morton stated, "the Act in its entirety must be construed so as to promote the principle of union democracy." *Id.* Thus, as stated *supra,* the overall purpose of the LMRDA is to promote democratic principles within labor organizations, and the LMRDA should not be interpreted in such a way to produce a contrary result. This is true no matter what Title of the LMRDA a court is asked to interpret.

The leadership of Local 715 insists that the International wrongfully imposed a trusteeship upon Local 715 where the International conducted a vote of the membership on the Agreement, all in violation of the LMRDA and the International's constitution.

The court is unable to detect a violation of the LMRDA, 29 U.S.C. § 401 *et seq.,* by the International. A trusteeship is defined as:

> [A]ny receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws.

29 U.S.C. § 402(h). The argument of the leadership of 715 must fail. The court is unable to find as a factual matter that the International suspended the autonomy otherwise available to Local 715.

■ The leadership of Local 715 concedes that the International has the authority under the International's constitution to call special meetings of any Local, therefore, the crux of the leadership's argument that a trusteeship was imposed in violation of the LMRDA upon Local 715 rests upon the fact the International called for a vote of the membership on the Agreement after the special meetings were held. However, this argument flies in the face of the underlying policy of the LMRDA and why Congress found it necessary to establish restrictions on the ability of parent labor organizations to impose trusteeships upon local unions. Congress established the restrictions to ensure that democratic processes of a local union would not be undermined by an unresponsive leadership. *See, Vestal v. Hoffa,* 329 F.Supp. 801 (M.D.Tenn.1971).

The leadership of Local 715 insists that the facts demonstrate the International suspended the autonomy of Local 715 where the International called for the vote over the objection of the leadership of Local 715. However, the LMRDA was not enacted for the benefit of leaders of labor organizations. *See, Local 3489, United Steelworkers of America v. Usery,* 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977). The LMRDA was enacted for the benefit of the rank and file and to ensure that the membership of local unions were guaranteed meaningful, democratic participation in labor organizations. *Id.* What can be more meaningful participation in the labor organization than deciding whether to accept or decline a contract proposal?

Moreover, as the court has previously noted in the prior proceedings before this court, there is a real question as to who is Local 715, the leadership, or the rank and file members? There is support for the proposition that the membership is Local 715, as the membership makes up the organization as it is recognized as an institution. *See, U.S. v. Int'l Bhd. of Teamsters,* 792 F.Supp. 1346, 1352–53 (S.D.N.Y.), *aff'd,* 981 F.2d 1362 (2nd Cir.1992); *Meader v. Dist. Lodge No. 4, IUMSWA,* 786 F.Supp. 95, 101–02 (D.Me. 1992); S.Rep. No. 187, 86th Cong., 1st Sess. pt. 3 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2324; 48 Am.Jur.2d, Labor and Labor Relations § 47–48. Thus, Local 715, the rank and file membership, has been empowered by the actions of the International, and Local 715 did not have its autonomy suspended by the calling of the vote by the International.

Were the court to find that the International suspended the autonomy of Local 715 through its actions by calling for a vote on the Agreement, the court would be making a factual determination that the International eliminated the meaningful participation of

the membership of Local 715. Clearly, such a determination would be against the weight of the evidence where it has been demonstrated the International enfranchised the membership of Local 715 and requested the membership to make a meaningful vote after open, frank debate.

The argument of the leadership of Local 715 does not forward the underlying goal of the act, but in fact, hinders the attainment of the goal of full participation of the membership of Local 715. The leadership may not rely upon the literal language of the LMRDA without considering the underlying policy goal that prompted Congress to act in the first instance. Therefore, the court finds that the International did not impose a trusteeship upon Local 715 as that term is defined by the LMRDA and how the LMRDA is to be applied to accomplish the goal of Congress; democratic labor organizations.

Because the court has found as a factual matter that no trusteeship was imposed upon Local 715, the court need not decide whether a trusteeship was imposed in violation of the International's constitution.

 Thus, having decided of all of the arguments advanced by the leadership of Local 715 as to why the Agreement should not be enforced against the leadership of Local 715, the court must fashion the appropriate relief to ensure that the terms of the Agreement are adhered to by all of the parties. The court has the authority to secure and protect the benefits of federal labor law by fashioning suitable law in accordance with the intent of Congress. *See, Highway Truck Drivers, Local 107 v. Cohen,* 219 F.Supp. 614, 615 (E.D.Pa.1963).

The International and Local 715 invoked the equitable powers of this court with the filing of their original Complaint seeking extraordinary relief. The original intent and purpose of the lawsuit was not the short-term goal of enjoining equipment removal or enforcing arbitration. Arbitration will not result in the ultimate, long-term goal of the union, which is to keep the Fort Wayne plant open employing roughly two thousand Local 715 members. To this goal of keeping the plant open, the parties have engaged in extensive negotiations. The Company made a

final offer which the membership of Local 715 voted to accept. Clearly, the International and Local 715, who are the parties that invoked the court's equitable powers, have within their combined grasp the power to resolve the underlying labor dispute by their own actions.

Therefore, the court orders the leadership of Local 715 to take affirmative action to ensure that the various grievances, unfair labor practice charges and associated lawsuits that are described in the Agreement are withdrawn as required by the Agreement. Effective relief in this case will not be complete if the court does not enforce the Agreement to which the parties have agreed.

 The court notes that the International and Local 715 are the parties that originally sought the equitable powers of this court; "[h]aving sought equity [Local 715] may be compelled to do equity." *United States v. Prof'l Air Traf. Controllers,* 438 F.2d 79, 84 (2nd Cir.1970), *cert. denied,* 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 661 (1971); *see also, Manufacturers' Finance Co. v. McKey,* 294 U.S. 442, 55 S.Ct. 444, 79 L.Ed. 982 (1935); *Pan American Petroleum & Transport Co. v. United States,* 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734 (1927). The principle applies equally to a party defendant as it does to a party complainant. *Brown, B. & Co. v. Lake Superior Iron Co.,* 134 U.S. 530, 10 S.Ct. 604, 33 L.Ed. 1021 (1890). The court's requirement that the leadership of Local 715 take affirmative action to ensure that the terms of the Agreement are satisfied by dismissing the grievances, unfair labor practices and associated lawsuits as dictated by the Agreement is based on the fundamental principle that whoever invokes the equitable power of the court and asks for the court's aid, submits himself to "the imposition of such terms as well-established equitable principles require." 27 Am.Jur.2d Equity § 134 (1966) (citing *Marietta Realty & Dev. Co. v. Reynolds,* 189 Ga. 147, 5 S.E.2d 347 (1939)). "The court may [ ] protect and give effect to the rights of one party while awarding relief the other." 27 Am.Jur.2d Equity § 134 (1966) (citing, *inter alia Kin-*

*ney–Coastal Oil Co. v. Kieffer,* 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961 (1928)).

*Conclusion*

For the foregoing reasons, defendant's Motion to Enforce Settlement Agreement is GRANTED, and Ray Wiseman, President of Local 715 and the other officers of Local 715 are ordered to take affirmative action to ensure that the grievances, unfair labor practices, and associated lawsuits are dismissed per the terms of the Agreement.